# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| CRAIG PARMER and MARK A. LAURANCE individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) | **CIVIL ACTION NO.**: |
| ) | |
| v. ) | **CLASS ACTION COMPLAINT** |
| ) | |
| LAND O'LAKES, INC., THE BOARD OF DIRECTORS OF LAND O'LAKES, INC., LAND O'LAKES, INC. RETIREMENT PLAN COMMITTEE, and JOHN DOES 1-30. ) ) ) ) ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiffs Craig Parmer and Mark A. Laurance ("Plaintiffs"), by and through their attorneys, on behalf of the Land O'Lakes Employee Savings & Supplemental Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Land O'Lakes, Inc. ("Land O'Lakes" or the "Company"), the Board of Directors of Land O'Lakes, Inc. ("Board") and its members

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

during the Class Period, and the Land O'Lakes Retirement Plan Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.     In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015) (*Tibble I*).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A),

with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.      The Plan has at all times during the Class Period maintained over a billion dollars in assets (including having 1.4 billion dollars in assets in 2018), qualifying it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  These assets are entrusted to the care of the Plan's fiduciaries.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.      Plaintiffs allege that during the putative Class Period (May 26, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.      To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider lower cost collective trusts that were available to the Plan as alternatives to certain mutual funds in the Plan.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.   Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**Plaintiffs**

13.     Plaintiff Craig Parmer ("Parmer") resides in Dover, Pennsylvania.  During his employment, Plaintiff Parmer participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

14.     Plaintiff Mark A. Laurance ("Laurance") resides in Sedro-Woolley, Washington.  During his employment, Plaintiff Laurance participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

15.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

16.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have

and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.[2]  Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

17.     Land O'Lakes is the Plan sponsor.  *See* 2018 Form 5500 at 1. Its corporate headquarters is located at 4001 Lexington Avenue North, Arden Mills, Minnesota.  Land O'Lakes describes itself as "one of America's premier agribusiness and food companies" with operations that span the spectrum from agricultural production to consumer foods.[3] With 2019 annual sales of $14 billion, Land O'Lakes is one of the nation's largest cooperatives, ranking 212 on the Fortune 500.[4]  "The company does business in all 50 states and more than 60 countries."[5]

---

[2]  *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

[3] https://www.landolakesinc.com/Press/News/2020-Q1-Earnings-Release

[4] *Id.*

[5] *Id.*

18.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.  First, the 2018 SPD identifies Land O'Lakes as the "Plan Administrator-Fiduciary." *See* Land O'Lakes Employee Savings and Supplemental Retirement Plan Summary Plan Description, December 2018 ("2018 SPD") at p. 22.

19.     Second, at least for a portion of the Class Period, in its role as Plan Administrator, Land O'Lakes exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets. Third, as part of its fiduciary responsibilities, Land O'Lakes designated Your Benefit Resources, Alight Solutions ("Alight"), as the Plan's recordkeeper.  2018 SPD at p. 22. Land O'Lakes also appointed other Plan fiduciaries in its role as a Plan administrator and through the Board (see below).   Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

20.     Fourth, Land O'Lakes also made discretionary decisions to make matching and discretionary contributions (explained below) to Plan participants.  2018 SPD at pp. 6, 7.

21.     Lastly, at all times, Land O'Lakes acted through its officers to perform Plan-related fiduciary functions.  These officers were acting in the course and scope of their employment.

### **Board Defendants**

22.     The Company acted through the Board to perform the Company's Plan-related fiduciary functions.  Upon information and belief, the Board appointed members of

the Committee. *See, e.g.* 2018 SPD at p. 20 ("[t]he Land O'Lakes Board has delegated authority to the Savings Plan Committee to make certain changes to the Plan by adopting a resolution."). Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

23.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

24.     Members of the Board of Directors for Land O'Lakes during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

25.     "The Land O' Lakes Retirement Plan committee works with an investment advisor to select the array of funds available within the Plan." 2018 SPD at p. 11. The Committee is tasked with monitoring the prudence of the Plan investments. *Id.*

26.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

27.    The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

28.    To the extent that there are additional officers and employees of Land O'Lakes who are/were fiduciaries of the Plan during the Class Period, or other individuals were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Land O'Lakes officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.    THE PLAN

29.    The Plan was established on April 1, 1975 and restated effective January 1, 2013.  2018 Auditor Report at p. 5.

30.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

31.    In general, "[e]mployees who are full time are automatically eligible to participate in the Plan." Report of Independent Certified Public Accountants for December 31, 2018 and 2017 ("2018 Auditor Report") at p. 5.

### *Contributions and Vesting*

32.    There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution, an employer matching contribution, and an employer profit sharing contribution.  2018 Auditor Report at p. 4.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id.*

33.    With regard to employee contributions, a participant may contribute "from 1% to 80% of their eligible compensation each year to the Plan."  *Id.*

34.    Land O'Lakes made discretionary decisions to make matching and discretionary contributions to Plan participants.  2018 SPD at pp. 6, 7.

35.    Matching contributions are made in two tiers. 2018 Auditor Report at p. 6. The first tier is for full time employees hired prior to January 1, 2006.  *Id.*  These employees are 100% vested when matching contributions are made.  *Id.*

36.    The second tier of matching contributions are for employees hired after January 1, 2006.  *Id.*  These employees "receive Employer matching contributions equal to 100% of the first 3% of pre-tax pay contributed, plus 50% of the next 2% of pre-tax pay contributed.  Matching contributions for employees who met eligibility on or after January 1, 2006 are subject to a four-year graded vesting schedule; 25% vesting is earned for each year of service." *Id.*

37.     Like other companies that sponsor 401(k) plans for their employees, Land O'Lakes enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

38.     Land O'Lakes also benefits in other ways from the Plan's matching program. It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company. By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

39.     Given the size of the Plan, Land O'Lakes likely enjoyed a significant tax and cost savings from offering a match.

### The Plan's Investments

40.     Several funds were available to Plan participants for investment each year during the putative Class Period, including several T.Rowe Price target date funds. As noted above, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. For 2018, the Plan offered 28 investment options, including 22 mutual funds and 1 collective trust valued at over a billion dollars, 2 Wells Fargo Short-Term investments, 2 stable value funds, and 1 separately managed account composed of several common stocks valued at $40,977,826.

41.     The Plan provides for automatic enrollment.  If a participant fails to take action within thirty days after enrollment material is mailed, the participant's "contributions and Company Match will be invested in the T. Rowe Price Retirement fund with a target date closest to the year" the participant reaches 65. 2018 SPD at p. 2.

42.     The Plan's assets under management for all funds as of the end of 2018 was $1,430,096,300.  2018 Auditor Report at p. 4.  From 2014 to 2017 the Plan's assets under management ranged from $1.1 billion to $1.5 billion.

***Plan Expenses***

43.     Administrative expense fees are charged to participant accounts on a monthly basis. 2018 SPD at p. 12.  "These expenses include, but aren't limited to, maintaining the Plan's website and call center, producing and mailing quarterly statements, and complying with government regulations."  *Id.*

## V.     CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between May 26, 2014 through the date of judgment (the "Class Period").

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

45.     The members of the Class are so numerous that joinder of all members is impractical.   The 2018 Form 5500 filed with the Dept. of Labor lists 11,461 Plan "participants with account balances as of the end of the plan year."   *Id*. at p. 2.

46.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.   Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

47.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.     Whether Defendants are fiduciaries of the Plan;

    B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

    C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.     The proper form of equitable and injunctive relief; and

    E.     The proper measure of monetary relief.

48.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

49.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

51.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

52.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.   Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

54.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Braden*, 588 F.3d at 598.

55.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.,* at 224 (quotation marks and citations omitted).   Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

56.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

57.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the

[fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

58.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary"), further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

59.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

60.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the

Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period and (2) lower recordkeeping and administrative fees.

61.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

62.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

63.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trusts § 90, cmt. b) (*Tibble II*).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at p. 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-

center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

64.   Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

65.   In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See* "*A Look at 401(k) Plan Fees*," *supra*, p. 2.

66.   The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See*

Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at p. 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.*, at 5.

67.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

68.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

69.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble I*, 135 S. Ct. at 1823.  In *Tibble I*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.*, at 1828.  In so holding, the Supreme Court referenced with approval the UPIA, treatises, and seminal decisions confirming the duty.

70.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence"

of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

71.     When large plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

72.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

73.     During the Class Period, the Plan lost millions of dollars by offering investment options that had similar or identical characteristics to other lower-priced investment options.

74.     The majority of funds in the Plan stayed relatively unchanged during the Class Period. In 2018, a majority of the funds in the Plan, at least 18 out of the Plan's 26

funds (69%), not including the separately managed account and short-term investment funds, were much more expensive than comparable funds found in similarly-sized plans (plans having over a billion dollars in assets). The expense ratios for funds in the Plan in some cases were up to *157%* (in the case of the T. Rowe Price Small-Cap Value) and *354%* (in the case of the Wells Fargo Money Market) above the median expense ratios in the same category:[7]

| Plan Fund | Expense Ratio[8] | Category | ICI Median Fee |
|---|---|---|---|
| T. Rowe Price Mid-Cap Growth | 0.75% | Domestic Equity | 0.33% |
| T. Rowe Price Small-Cap Value | 0.85% | Domestic Equity | 0.33% |
| T. Rowe Price Retirement 2005 | 0.53% | Target Date | 0.47% |
| T. Rowe Price Retirement 2010 | 0.53% | Target Date | 0.47% |
| T. Rowe Price Retirement 2015 | 0.56% | Target Date | 0.47% |
| T. Rowe Price Retirement 2025 | 0.63% | Target Date | 0.47% |
| T. Rowe Price Retirement 2030 | 0.66% | Target Date | 0.47% |
| T. Rowe Price Retirement 2045 | 0.71% | Target Date | 0.47% |
| T. Rowe Price Retirement 2040 | 0.70% | Target Date | 0.47% |
| T. Rowe Price Retirement 2035 | 0.68% | Target Date | 0.47% |
| T. Rowe Price Retirement 2050 | 0.71% | Target Date | 0.47% |

[7] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[8] The listed expense figures are taken from summary prospectuses published in 2020.

| T. Rowe Price Retirement 2055 | 0.72% | Target Date | 0.47% |
|---|---|---|---|
| T. Rowe Price Retirement 2020 | 0.59% | Target Date | 0.47% |
| T. Rowe Price Retirement 2060 | 0.72% | Target Date | 0.47% |
| PIMCO Total Return Instl | 0.63% | Domestic Bond | 0.36% |
| Dodge & Cox International Stock | 0.63% | International Equity | 0.50% |
| T. Rowe Price Retirement Balanced | 0.38% | Non-Target Date Balanced Fund | 0.16% |
| Wells Fargo Gov. MMkt | 0.50% | Money Market | 0.11% |

75.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with over 1 billion dollars in assets was 0.56% using 2015 data compared with 0.47% in 2016.  Accordingly, the median expense ratios in 2020 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2020 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

76.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

77.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

78.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

79.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower

costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017) (*Tibble III*).

80.     In several instances during the Class Period, including funds in the Plan in 2018 as demonstrated below, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2020 expense ratios to demonstrate how much more expensive (difference between the lower expense ratio of the "I-Class" shares and that of share class of the fund in the Plan as a percentage of the lower expense ratio) the funds were than their identical counterparts:

| Fund in Plan | 2020 Exp. Ratio | Lower Cost Share | 2020 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| TRRHX T. Rowe Price Retirement 2025 Fund | 0.63% | TRPHX T. Rowe Price Retirement I 2025 Fund I Class | 0.50 % | Target Date | 26% |
| TRRCX T. Rowe Price Retirement 2030 Fund | 0.66% | TRPCX T. Rowe Price Retirement I 2030 Fund I Class | 0.53% | Target Date | 25% |
| TRRDX T. Rowe Price Retirement 2040 Fund | 0.70 % | TRPDX T. Rowe Price Retirement I 2040 Fund I Class | 0.58 % | Target Date | 21% |
| TRRKX T. Rowe Price Retirement 2045 Fund | 0.71 % | TRPKX T. Rowe Price Retirement I 2045 Fund I Class | 0.59 % | Target Date | 20% |
| TRRJX T. Rowe Price Retirement 2035 Fund | 0.68 % | TRPJX T. Rowe Price Retirement I 2035 Fund I Class | 0.56 % | Target Date | 21% |

| Fund in Plan | 2020 Exp. Ratio | Lower Cost Share | 2020 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| TRRMX<br>T. Rowe Price Retirement 2050 Fund | 0.71 % | TRPMX<br>T. Rowe Price Retirement I 2050 Fund I Class | 0.59 % | Target Date | 20% |
| TRRMX<br>T. Rowe Price Retirement 2055 Fund | 0.72% | TRRNX<br>T. Rowe Price Retirement 2055 Fund I Class | 0.58% | Target Date | 24% |
| TRRBX<br>T. Rowe Price Retirement 2020 Fund | 0.59% | TRBRX<br>T. Rowe Price Retirement I 2020 Fund I Class | 0.46 % | Target Date | 28% |
| TRRBX<br>T. Rowe Price Retirement 2060 Fund | 0.72% | TRPLX<br>T. Rowe Price Retirement 2060 Fund I | 0.59% | Target Date | 22% |
| TRRGX<br>T. Rowe Price Retirement 2015 Fund | 0.56% | T. Rowe Price Retirement I 2015 Fund I Class | 0.43% | Target Date | 30% |
| TRRFX<br>T. Rowe Price Retirement 2005 Fund | 0.53% | T. Rowe Price Retirement I 2005 Fund I Class | 0.41% | Target Date | 29% |
| TRRAX<br>T. Rowe Price Retirement 2010 Fund | 0.53% | TRPAX<br>T. Rowe Price Retirement I 2010 Fund I Class | 0.40% | Target Date | 33% |
| RPMGX<br>T. Rowe Price Mid-Cap Growth | 0.75% | RPTIX<br>T. Rowe Price Mid-Cap Growth I | 0.62% | Domestic Equity | 21% |
| PRSVX<br>T. Rowe Price Small-Cap Value | 0.85% | PRVIX<br>T. Rowe Price Small-Cap Value I | 0.73% | Domestic Equity | 16% |

| Fund in Plan | 2020 Exp. Ratio | Lower Cost Share | 2020 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| TRRIX T. Rowe Price Retirement Balanced | 0.52% | TRPTX T. Rowe Price Retirement Balanced I | 0.38% | Non-Target Date Balanced Fund | 37% |

81.     The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

82.     As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  Indeed, here purchase and sale of the I share class requires a $1 million minimum initial investment and there is no minimum for additional purchases, although the initial investment minimum generally is waived for financial intermediaries and retirement plans.  *See, e.g., Davis et al. v. Washington Univ. et al.*, No. 18-3345, slip op. at 5 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

83.     The following is a sampling of the assets under management as of the end of 2018:

| Fund | Category | AUM |
|---|---|---|
| RPMGX T. Rowe Price Mid-Cap Growth | Domestic Equity | $ 101,018,122 |
| TRRHX  T. Rowe Price Retirement 2025 Fund | Target Date | $ 56,283,417 |
| TRRCX  T. Rowe Price Retirement 2030 Fund | Target Date | $ 60,700,999 |
| TRRDX  T. Rowe Price Retirement 2040 Fund | Target Date | $ 50,039,327 |
| TRRKX  T. Rowe Price Retirement 2045 Fund | Target Date | $ 40,921,194 |
| TRRJX  T. Rowe Price Retirement 2035 Fund | Target Date | $ 56,897,293 |
| TRRMX  T. Rowe Price Retirement 2050 Fund | Target Date | $ 36,473,529 |
| TRRMX  T. Rowe Price Retirement 2055 Fund | Target Date | $ 21,697,994 |
| TRRBX  T. Rowe Price Retirement 2020 Fund | Target Date | $ 39,755,515 |
| PTTRX PIMCO Total Return Instl | Domestic Bond | $ 44,665,923 |

84.     All of the lower share class alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's

investments, including the above-referenced funds, into the lower share classes at the earliest opportunity.

85.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

86.     Moreover, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs. *Tibble III*, 2017 WL 3523737, at * 8.   Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Id.*, at * 11.  This basic tenet of good fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A fiduciary's task is to negotiate    and/or    obtain    reasonable    fees    for    investment    options    and recordkeeping/administration fees independent of each other if necessary.

87.     By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

*__Failure to Investigate Availability of Lower Cost Collective Trusts__*

88.     Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds, which are pooled investment products.

89.     As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts, § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

90.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds. Defendants knew this, or at least should have known this, because at least one of the Plan's funds was a collective trust during the Class Period.

91.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the

Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses.  As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

92.    Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[9]

---

[9] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

93.   Yet another indication of Defendants' lack of a prudent investment evaluation process was their failure to identify available collective trusts.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, the following T. Rowe Price funds in the Plan in 2018 were available as collective trusts in 2018 and most of the Class Period:

| Fund in Plan | 2020 Exp. Ratio | Collective Trust Version | 2020 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2005 Fund | 0.53% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 15% |
| T. Rowe Price Retirement 2010 Fund | 0.53% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 15% |
| T. Rowe Price Retirement 2015 Fund | 0.56% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 22% |
| T. Rowe Price Retirement 2025 Fund | 0.63% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 37% |
| T. Rowe Price Retirement 2030 Fund | 0.66% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 44% |
| T. Rowe Price Retirement 2040 Fund | 0.70 % | T.Rowe Price Retirement Tr-A | .46% | Target Date | 52% |

| Fund in Plan | 2020 Exp. Ratio | Collective Trust Version | 2020 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2045 Fund | 0.71 % | T.Rowe Price Retirement Tr-A | .46% | Target Date | 54% |
| T. Rowe Price Retirement 2035 Fund | 0.68 % | T.Rowe Price Retirement Tr-A | .46% | Target Date | 48% |
| T. Rowe Price Retirement 2050 Fund | 0.71 % | T.Rowe Price Retirement Tr-A | .46% | Target Date | 54% |
| T. Rowe Price Retirement 2020 Fund | 0.59 % | T.Rowe Price Retirement Tr-A | .46% | Target Date | 28% |
| T. Rowe Price Retirement 2060 Fund | 0.72% | T.Rowe Price Retirement Tr-A | .46% | Target Date | 57% |

94.    In 2017, the minimum amount for investing in T. Rowe Price target date collective trusts was $20 million.  In 2018, the top 8 target date funds in the Plan had an average amount of $45.3 million in assets under management easily meeting the threshold requirement for collective trusts.  Although, as alleged above, these minimums could have been waived if the Plan's fiduciaries requested it.  Yet, despite the availability of lower-cost T.Rowe Price collective trusts, Defendants did not transfer Plan holdings to these collective trusts, thus breaching their fiduciary duties.

95.    Because of the Plan's size and assets under management for the Plan's funds, the Plan could have reaped considerable cost savings by using collective trusts.  Again,

failure to identify these available collective trusts was either due to Defendants' failure to negotiate with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.

96.     In summary, the Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of certain collective trusts in the same investment style of mutual funds in the Plan, thus causing the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively-Managed and Actively-Managed Funds*

97.     As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828.  Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts, § 100 cmt. b(1).

98.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington    Post,    available    at    https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively-managed funds "lagged their passive

counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

99.     Indeed, on average funds with high fees perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

100.     During the Class Period Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. This failure is a further indication that Defendants lacked a prudent investment monitoring process.

101.     The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style. The chart below analyzes funds in the Plan in 2018 using 2020 expense ratios as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Fund in Plan | Net Expense Ratio | Passive/Active Lower Cost Alternative[10] | Net Expense Ratio | Type | % Fee Excess |
|---|---|---|---|---|---|
| TRRHX T. Rowe Price Retirement 2025 | 0.63 % | FQIFX Fidelity Freedom Index 2025 Investor | 0.12 % | Target Date | 425% |
| | | RFDTX American Funds 2025 Trgt Date Retire R6 | 0.33 % | | 91% |
| TRRCX T. Rowe Price Retirement 2030 | 0.66 % | FXIFX Fidelity Freedom Index 2030 Investor | 0.12 % | Target Date | 450% |
| | | RFETX American Funds 2030 Trgt Date Retire R6 | 0.35 % | | 86% |
| TRRKX T. Rowe Price Retirement 2045 | 0.71 % | FIOFX Fidelity Freedom Index 2045 Investor | 0.12 % | Target Date | 492% |
| | | RFHTX American Funds 2045 Trgt Date Retire R6 | 0.38 % | | 87% |
| TRRDX T. Rowe Price Retirement 2040 | 0.70 % | FBIFX Fidelity Freedom Index 2040 Investor | 0.12 % | Target Date | 483% |
| | | RFGTX American Funds 2040 Trgt Date Retire R6 | 0.38 % | | 84% |
| TRRJX T. Rowe Price Retirement 2035 | 0.68 % | FIHFX Fidelity Freedom Index 2035 Investor | 0.12 % | Target Date | 467% |
| | | RFFTX American Funds 2035 Trgt Date Retire R6 | 0.37 % | | 84% |

---

[10] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). Where only one fund is listed, index funds are identified by the word "index" following the fund name. Actively managed funds don't have this designation. The listed expense figures are taken from summary prospectuses published in March 2020.

| Fund in Plan | Net Expense Ratio | Passive/Active Lower Cost Alternative[10] | Net Expense Ratio | Type | % Fee Excess |
|---|---|---|---|---|---|
| TRRMX T. Rowe Price Retirement 2050 | 0.71 % | FIPFX Fidelity Freedom Index 2050 Investor | 0.12 % | Target Date | 492% |
| | | RFITX American Funds 2050 Trgt Date Retire R6 | 0.39 % | | 82% |
| TRRNX T. Rowe Price Retirement 2055 | 0.72 % | FDEWX Fidelity Freedom Index 2055 Investor | 0.12 % | Target Date | 500% |
| | | RFKTX American Funds 2055 Trgt Date Retire R6 | 0.40 % | | 80% |
| TRRBX T. Rowe Price Retirement 2020 | 0.59 % | FPIFX Fidelity Freedom Index 2020 Investor | 0.12 % | Target Date | 392% |
| | | RRCTX American Funds 2020 Trgt Date Retire R6 | 0.31 % | | 90% |
| TRRLX T. Rowe Price Retirement 2060 | 0.72 % | FDKLX Fidelity Freedom Index 2060 Investor | 0.12 % | Target Date | 500% |
| | | RFUTX American Funds 2060 Trgt Date Retire R6 | 0.41 % | | 76% |
| TRRGX T. Rowe Price Retirement 2015 | 0.56 % | FLIFX Fidelity Freedom Index 2015 Investor | 0.12 % | Target Date | 367% |
| | | RFJTX American Funds 2015 Trgt Date Retire R6 | 0.31 % | | 81% |
| TRRFX T. Rowe Price Retirement 2005 | 0.53 % | FJIFX Fidelity Freedom Index 2005 Investor | 0.12 % | Target Date | 342% |
| | | RFTTX American Funds 2010 Trgt Date Retire R6 | 0.31 % | | 71% |

| Fund in Plan | Net Expense Ratio | Passive/Active Lower Cost Alternative[10] | Net Expense Ratio | Type | % Fee Excess |
|---|---|---|---|---|---|
| TRRAX T. Rowe Price Retirement 2010 | 0.53 % | FKIFX Fidelity Freedom Index 2010 Investor | 0.12 % | Target Date | 342% |
| | | RFTTX American Funds 2010 Trgt Date Retire R6 | 0.31 % | | 71% |
| RPMGX $ T. Rowe Price Mid-Cap Growth | 0.75% | DBMYX BNY Mellon Sm/Mid Cp Gr Y | 0.65% | Domestic Equity | 15% |
| PTTRX PIMCO Total Return Instl | 0.71% | FXNAX Fidelity US Bond Index | 0.03% | Domestic Bond | 2400% |
| | | JIBFX Johnson Inst. Core Bond | 0.25% | | 184% |
| DODFX Dodge & Cox International Stock | 0.63% | FSPSX Fidelity International Index | 0.04% | International Equity | 1475% |
| | | VWILX Vanguard International Growth Adm | 0.32% | | 97% |
| TRPTX T. Rowe Price Retirement Balanced I | 0.38% | VBAIX Vanguard Balanced Index I | 0.06% | Non-Target Date Balanced Fund | 533% |
| | | RLBGX American Funds American Balanced R6 | 0.28% | | 35% |
| NWGXX Wells Fargo Gov. MMkt | 0.50% | VMFXX  Vanguard Federal MMkt Inv | 0.11% | Money Market | 354% |

102.    The above alternative funds had better performances than the Plan's funds in their 3 and 5 year average returns as of 2020.

103.   Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial. These alternative funds (both active and passive) also had better performances than the Plan's funds at the 3 and 5 year marks when compared to the same benchmark as indicated below:

| Plan Fund | Alternative Fund(s) | Benchmark |
|---|---|---|
| T. Rowe Price Retirement 2005 | FJIFX Fidelity Freedom Index 2005 Investor | Vanguard Target Retirement 2005 Inv |
| | RFTTX American Funds 2010 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2010 | FKIFX Fidelity Freedom Index 2010 Investor | Vanguard Target Retirement 2010 Inv |
| | RFTTX American Funds 2010 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2015 | FLIFX Fidelity Freedom Index 2015 Investor | Vanguard Target Retirement 2015 Inv |
| T. Rowe Price Retirement 2020 | FPIFX Fidelity Freedom Index 2020 Investor | Vanguard Target Retirement 2020 Inv |
| | RRCTX American Funds 2020 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2025 | FQIFX Fidelity Freedom Index 2025 Investor | Vanguard Target Retirement 2025 Inv |
| | RFDTX American Funds 2025 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2030 | FXIFX Fidelity Freedom Index 2030 Investor | Vanguard Target Retirement 2030 Inv |
| | RFETX American Funds 2030 Trgt Date Retire R6 | |

| | | |
|---|---|---|
| T. Rowe Price Retirement 2035 | FIHFX Fidelity Freedom Index 2035 Investor | Vanguard Target Retirement 2035 Inv |
| | RFFTX American Funds 2035 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2040 | FBIFX Fidelity Freedom Index 2040 Investor | Vanguard Target Retirement 2040 Inv |
| | RFGTX American Funds 2040 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2045 | FIOFX Fidelity Freedom Index 2045 Investor | Vanguard Target Retirement 2045 Inv |
| | RFHTX American Funds 2045 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2050 | FIPFX Fidelity Freedom Index 2050 Investor | Vanguard Target Retirement 2050 Inv |
| | RFITX American Funds 2050 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2055 | FDEWX Fidelity Freedom Index 2055 Investor | Vanguard Target Retirement 2055 Inv |
| | RFKTX American Funds 2055 Trgt Date Retire R6 | |
| T. Rowe Price Retirement 2060 | FDKLX Fidelity Freedom Index 2060 Investor | Vanguard Target Retirement 2060 Inv |
| | RFUTX American Funds 2060 Trgt Date Retire R6 | |
| T. Rowe Price Mid-Cap Growth | DBMYX BNY Mellon Sm/Mid Cp Gr Y | iShares Russell Mid-Cap Growth ETF |
| PIMCO Total Return Instl | FXNAX Fidelity US Bond Index | iShares Core U.S. Aggregate Bond ETF |
| | JIBFX Johnson Inst. Core Bond | |
| Dodge & Cox International Stock | FSPSX Fidelity International Index | iShares MSCI EAFE ETF |
| | VWILX | |

| | Vanguard International Growth Adm | |
| --- | --- | --- |
| T. Rowe Price Retirement Balanced I | VBAIX Vanguard Balanced Index I | 40% SPY, 60% AGG Composite |
| | RLBGX American Funds American Balanced R6 | |

104.    A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

105.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

106.    Additionally, with regard to this case in particular, the Plan's fiduciaries cannot justify selecting actively-managed funds over passively-managed ones.  As noted *supra*, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund in the short term, they rarely do so over a longer term.  In this case, there is objective evidence that selection of actively-managed funds over passively-managed ones with materially similar characteristics was unjustified. Comparing the five-year returns of some of the Plan's top (by asset amount) actively-managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that, accounting for risk and fees paid, the actively-managed funds lagged behind in performance.  The chart below indicates the efficiency, or lack thereof, of the

active funds (*i.e.*, the return needed by the actively-managed fund, taking risk factors into

account, to match the returns of the passively-managed fund):

| Fund Name/Comparator | Expense Ratio[11] | Return (5 Year) | INDEX Report/Return Deficiency |
|---|---|---|---|
| T. Rowe Price Retirement 2030 | 0.65 | 4.41 | Fails Efficiency Requires 1.32% more return to pass |
| Fidelity Freedom Index 2030 Investor | 0.12 | 4.92 | |
| | | | |
| T. Rowe Price Retirement 2035 | 0.68 | 4.46 | Fails Efficiency Requires 1.34% more return to pass |
| Fidelity Freedom Index 2035 Investor | 0.12 | 4.89 | |
| | | | |
| T. Rowe Price Retirement 2025 | 0.62 | 4.29 | Fails Efficiency Requires 1.18% more return to pass |
| Fidelity Freedom Index 2025 Investor | 0.12 | 4.58 | |
| | | | |
| T. Rowe Price Retirement 2020 | 0.58 | 4.14 | Fails Efficiency Requires 1.14% more return to pass |
| Fidelity Freedom Index 2020 Investor | 0.12 | 4.51 | |
| | | | |
| T. Rowe Price Retirement 2045 | 0.71 | 4.47 | Fails Efficiency Requires 0.92% more return to pass |
| Fidelity Freedom Index 2045 Investor | 0.12 | 4.66 | |
| | | | |
| T. Rowe Price Retirement 2050 | 0.71 | 4.48 | Fails Efficiency Requires 0.92% more return to pass |
| Fidelity Freedom Index 2050 Investor | 0.12 | 4.67 | |
| | | | |
| T. Rowe Price Retirement 2055 | 0.71 | 4.43 | |

---

[11] Expense ratios are as of May 2020.

| Fund Name/Comparator | Expense Ratio[11] | Return (5 Year) | INDEX Report/Return Deficiency |
|---|---|---|---|
| Fidelity Freedom Index 2055 Investor | 0.12 | 4.65 | Fails Efficiency Requires 0.97% more return to pass |
|  |  |  |  |
| T. Rowe Price Retirement 2015 | 0.55 | 3.88 | Fails Efficiency Requires 1.22% more return to pass |
| Fidelity Freedom Index 2015 Investor | 0.12 | 4.42 |  |

107.   The comparator funds above belong to the same peer group[12] as the Plan funds.  Comparing funds in the same peer group is an industry-standard that allows comparisons to be "apples to apples."  Here, the following data points were used to calculate the Plan fund's efficiency: r-squared, standard deviation, and 5-year return.  The same data points were used on both the active and passive funds to calculate the incremental cost and incremental return and then to determine if the active fund is efficient, less than efficient, or fails efficiency.  Ten of the biggest actively managed funds in terms of asset size (including the eight mentioned above) fail efficiency:  T. Rowe Price Retirement 2025; T. Rowe Price Retirement 2030; T. Rowe Price Retirement 2045; T. Rowe Price Retirement 2040; T. Rowe Price Retirement 2035; T. Rowe Price Retirement 2050; T. Rowe Price Retirement 2055; T. Rowe Price Retirement 2020; and T. Rowe Price Retirement 2015; and PIMCO Total Return Instl.

---

[12] "Peer group" refers to a group of funds that share similar traits, such as industry sector or size, that lends itself to relative value analysis.  Relative valuation among peers in a group has proven to be efficient and effective, and the use of peer groups is one of the most widely used and accepted methods of equity analysis used by

108.   The Plan's actively-managed funds charged unjustified fees for additional reasons.  First, taking the ten funds listed above for example, analysis reveals that all but the PIMCO Total Return Instl. Fund are what are called closet index funds because they charge as if they are actively managed but vary little from the index benchmark.  In other words, the investments closely follow the underlying benchmark (what a lower cost index fund does), but they charge actively-managed fund prices.  Second, the funds assume a higher risk than the comparison passive funds.  Third, the average cost of the ten funds is 0.50% more than the average of the passively-managed comparison funds.  In sum, these top ten actively-managed funds all have a higher expense, greater risk, and lower returns than their passively-managed comparison funds, and, as a result, these ten funds do not adequately compensate the Plan participants.

109.   Defendants' failure to investigate lower cost alternative investments (both actively- and passively-managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**C.**   **Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

110.   The Plan's recordkeeper since at least 2014 has been Alight.  The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a range of services to a defined contribution plan as part of its package of services.

---

professional analysts.  *See* https://www.investopedia.com/terms/p/peer-group.asp
(last visited May 22, 2020).

These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[13] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

111.   Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.  In this case for example, "Land O'Lakes partners with Financial Engines," which purportedly "provides independent, objective advice from unbiased experts, quarterly retirement updates, online account monitoring to help participants stay on track and a personalized plan." 2018 SPD at p. 11.  A portion of the fees the Plan participants pay to utilize the Financial Engines service ends up in the coffers of Alight.

112.   According to the 2018 Form 5500, Financial Engines collected more than $1.5 million in "Advice fees" and "Professional management fees" from Plan participants, 55% of which it then paid to Alight. Overall, between 2014 and 2018 Financial Engines received at least $5.1 million in compensation from Plan participants, of which more than half was remitted to the Plan's recordkeepers, Hewitt Associates and Alight.

---

[13] Qualified Domestic Relations Order.

113.   It is also noteworthy that during the Class Period, Financial Engines, as noted above, paid additional millions of dollars to Hewitt Associates and Alight from money received from Plan participants. However, according to https://www.edelmanfinancialengines.com/services, Financial Engines provides no services relative to plan administration or recordkeeping. Thus, there are no apparent services provided by Financial Engines that would justify paying so much of their compensation to the recordkeeper.

114.   The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

115.   The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

116.   Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

117.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees  (last  visited  March  19, 2020).

118.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

119.    First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that  summarize  and  contextualize  the  recordkeeper's  compensation,  such  as  fee transparencies,  fee  analyses,  fee  summaries,  relationship  pricing  analyses,  cost-competitiveness analyses, and multi-practice and standalone pricing reports.

120.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

121.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

122.     Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.  For example, as noted above, Alight has been the Plan's recordkeeper since at least 2014 (with no

change), and there is no evidence Defendants have undertaken an RFP since 2014 in order to compare Alight's costs with those of others in the marketplace. Alight's direct compensation for recordkeeping services during the Class Period has been, by any measure, unreasonable. From 2014 to 2018 the direct annual recordkeeping per participant fees were as follows:

| Year | Direct Recordkeeping Fees |
|------|---------------------------|
| 2014 | $49 |
| 2015 | $49 |
| 2016 | $166 |
| 2017 | $32 |
| 2018 | $44 |

123. By way of comparison, we can look at what other plans are paying for recordkeeping. One data source, the *401k Averages Book* (20th ed. 2020)[14] studies Plan fees for smaller plans, those under $200 million in assets. Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping. That is because recordkeeping and administrative fees should ***decrease*** as a Plan increases in size. For example, a plan with 200 participants and $20 million in assets has an average

---

[14] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at p. 2.

recordkeeping and administration cost (through direct compensation) of $12 per participant. *401k Averages Book* at p. 95. A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant. *Id*., at p. 108. Thus, the Plan, with over a billion dollars in assets and over 9,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

124. Looking at the Plan's total compensation for recordkeeping and administration costs also reveals fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) throughout the Class Period on a per participant annual basis was conservatively above $106 per participant per year, spiking as high as $231 per participant in 2016.

125. As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan. The maximum  indirect compensation received by Alight for recordkeeping services can be estimated to a reasonable degree of certainty using publicly available information[15] because "revenue sharing' is divvied among all the plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers." *401k Averages Book*, at p. 7, Answer to FAQ No. 14.

---

[15] *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

126.   If all the indirect revenue sharing reported on the Plan's Form 5500 (or a significant portion) were paid to Alight then, prior to rebates, if any, the annual per participant recordkeeping fee would have been as follows during the Class Period:

| Year | No. of Participants | Direct Costs | Indirect Costs Through Revenue Sharing | P/P Costs |
|------|---------------------|--------------|----------------------------------------|-----------|
| 2018 | 11461 | $503,505.00 | $803,700.00 | $114.06 |
| 2017 | 10768 | $340,719.00 | $806,864.00 | $106.57 |
| 2016 | 9961 | $1,657,534.00 | $641,427.00 | $230.80 |
| 2015 | 9764 | $475,781.00 | $588,297.00 | $108.98 |
| 2014 | 9569 | $465,372.00 | $566,729.00 | $107.86 |

127.   These amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans.[16]

128.   By way of further comparison, a 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grows, a plan can negotiate lower recordkeeping fees:[17]

---

[16] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

[17]   *See*   https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.   Given the general trend of

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

129.    Additionally, as plan asset size increases, so should the cost per participant decrease.  *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")  Given that the Plan grew in size both in terms of participants and assets from the end of 2014 to the end of 2018, there should have been a significant decrease in per participant recordkeeping and administrative costs, but there was not.  It was quite the opposite with per participant costs at $108 in 2014 and $114 in 2018.

130.    Given the size of the Plan's assets during the Class Period and total number of  participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

131.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control

---

decreasing recordkeeping fees, the  average cost per participant from ***nearly 20 years ago*** cited in the 1998 DOL Study would be much lower today.

recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**D.     Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

132.    The structure of this Plan is rife with potential conflicts of interest because Alight and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.   As noted above, Land O'Lakes established a relationship with Financial Engines which directly benefitted the Plan's recordkeepers to the tune of millions of dollars and at the expense of Plan participants.

133.    There appears to be no reasonable justification for the millions of dollars collected from Plan participants that Financial Engines paid to the Plan's recordkeepers.

134.    The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Alight and its affiliates and ensure that the fees charged by Alight and its affiliates were reasonable and in the best interests of the Plan and its participants.   Clearly, Defendants failed this aspect of their fiduciary duties.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee Defendants)**

135.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

136.    At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

137.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

138.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

139.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan

would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

140.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

141.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Land O'Lakes and the Board Defendants)

142.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

143.    Land O'Lakes and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

144.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately

performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

145.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

146.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)   Failing to monitor the processes by which Plan investments were evaluated,  the Prudence Defendants' failure to investigate the availability of lower-cost share classes, and the Prudence Defendants' failure to investigate the availability of lower-cost collective trust vehicles; and

(c)     Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

147.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

148.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

149.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: May 26, 2020                **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By:    /s/ *Vernon J. Vander Weide*                  .
          Vernon J. Vander Weide, #0112173
          Robert K. Shelquist, #21310X
      100 South Washington Avenue, Suite 2200
      Minneapolis, MN 55401
      Telephone:  (612) 339-6900
      Facsimile:   (612) 339-0981
      rkshelquist@locklaw.com

      Mark K. Gyandoh, Esquire
      (*Motion Pro Hac Vice Pending*)
      **CAPOZZI ADLER, P.C.**
      312 Old Lancaster Road
      Merion Station, PA 19066
      markg@capozziadler.com
      Telephone:  (610) 890-0200
      Facsimile:   (717) 233-4103

      Donald R. Reavey, Esquire
      **CAPOZZI ADLER, P.C.**
      2933 North Front Street
      Harrisburg, PA 17110
      donr@capozziadler.com
      Telephone:  (717) 233-4101
      Facsimile:   (717) 233-4103

      ***Counsel for Plaintiffs and the Putative Class***